Good morning. I'm Milt Silverman. I'm going to take less than ten minutes. We're splitting our time ten and ten. Hopefully I'll have a little for rebuttal. I am the lawyer for Cheryl Crowe, Stephen Crowe, Michael Crowe, Shannon Crowe. I was the lawyer for Grandma Kennedy, but in the nine years it's taken this case to get this far, she's died. The district court's decision in this case systematically obliterates and destroys the protections of the Fourth, Fifth, and Fourteenth Amendments. If allowed to stand, it eliminates the protections of the Fifth Amendment in the following way. According to the lower court's ruling in this case, under its reasoning, the only time the Fifth Amendment would be violated is when the police officer who procures the confession is also the prosecutor who introduces it into evidence after a trial judge has erroneously admitted it into evidence, and it's been reversed on appeal on that ground. Then a 1983 cause of action would lie for a violation of the Fifth Amendment. The circuit court in Murray v. Earle correctly characterized this as a not persuasive. Since you've got a limited amount of time, could you help me understand a little bit about the facts of the case in which we pretty well understand the law? But I'm trying to understand with regard to the interrogation and arrest of Michael. Yes. As I understand, he was taken from the home to the police station. Yes. That's where the questioning first began. Is that correct? There was questioning of all the Crow family members. We aren't sure exactly of the time because nobody writes down the time, but sometime I'd say between 10 and 4, all of the Crow family members were questioned for roughly an hour, an hour and a half each. At the police department? At the downtown El Cajon. Okay, so they were at the police station. Yes. All right, and at what point was Michael Mirandized? He was Mirandized at the very first, he was Mirandized each time. But he was Mirandized separate and apart from his parents? Yes, the parents were not, no one was Mirandized except him. Was he ever given access to his parents after or during, before he consented under the Miranda warning? He was there with his parents. I'm trying to find out if he consented to the interrogation, to the questioning, after being Mirandized. Yes. Did he have an adult present with him? No. So he had no parent around when the questioning began? No. All right, thank you. And then what happens, the first interrogation, if you will, I call it an interview really, although we have no tape of it unlike the others because it was, quote, lost. You might remember that little thing. Don't take your time on the sideline detail. Okay, did you want more information about the interrogations, though, because there were more than that. I know, there were several. The one on the Monday afternoon or whenever it was, morning or whatever, then the next thing that happened on that day was consent to photographs, correct? Yes, that happens on that day. This is on Wednesday. She dies Tuesday night. She's discovered Wednesday morning. All right, Wednesday. In that sequence, does Michael, when he consents to be photographed, have any access to his parents? Yes, he does talk to his parents. He talks to his father. Father's been told by Sweeney, you either do this or you'll be arrested and they'll put you in jail. All right. Good enough. Michael's Fifth Amendment rights were violated. His confession was coerced. His confession was used at the grand jury, bail hearings, 707, and trial of the real killer. This satisfies Chavez's requirement of use in any criminal case. Counselman holds, which is, of course, the Supreme Court of the United States, holds that the grand jury proceeding is part of a criminal case. I would suggest a practical test for what a criminal case is. We know from Higazi that Higazi correctly reasons this is the guy with the transponder during the 9-11 thing, and he's on the 51st floor and they got the wrong guy. And what the Higazi court really points out is, look, if you're talking about sentencing is obviously part of a criminal case,  So criminal case has to include more than just a trial. The test that I would use would be, or I would propose, would be one where you looked at it like using Embler v. Pacman and Burns v. Reed and Buckley v. Fitzsimmons, where if you have a situation where a prosecutor can claim judicial immunity for something, like presenting evidence in a grand jury, why isn't that part of a criminal case? And I would suggest that those are basically two sides of the same coin. The Court incorrectly said that the purpose of an interrogation is to procure a confession. This is worthy of some law book in a totalitarian regime, but not in our American jurisprudence. The purpose of an interrogation is not to procure a confession. The purpose of an interrogation is to obtain truthful information by means consistent with our concepts of ordered liberty. Well, and that's my next point, which is the Court really mangles Cooper, and it does it in a way which I assume is unintentional. In fact, I will say it's unintentional, but horribly misreads Cooper, because what the Court below says is, well, we used to think, as the Ninth Circuit said in Cooper v. Dupnall, that mere coercion isn't enough, but of course this was reversed in Chavez by the Supreme Court of the United States. And if you look in Westlaw, the decision that you authored, Westlaw says, oh, well, Crow v. Escondido, it recognizes that Chavez overrules Cooper. No, it doesn't. What happens is that Cooper's, the sentence that the Court breaks up is that mere coercion isn't enough, provided that there's also, it has to be used in the criminal case. And in this case, what the Court does is put the period right in the middle of that sentence, instead of, as you wrote it, instead of carrying the entire idea together. So what you get from this Court saying is that mere coercion isn't enough to violate the 14th Amendment. Well, that's not the law in this, when you got remanded, Chavez, this Court held, and cites cases going back to the 1950s, that coercion by police officers does violate the 14th Amendment. The district court says Michael's interrogation was not necessarily pleasant. Right, it wasn't necessarily pleasant. That's why it was on the cover of Amnesty International. That's why the juror in the Tewitt criminal trial said she was shocked and thought it was psychological torture. That's why Dr. Colarusso called it the most extreme form of child abuse he'd seen in 40 years. That's why a retired Justice Puglia, who unfortunately has also died in the time that this case has taken to get this far, described it as a coercive police scheme. The lower court's ruling ignores the Supreme Court's ruling in Rivera v. Massachusetts General that deliberate indifference to medical needs of a pretrial detainee violates substantive due process, and it ignores DeShaney v. Winnebago that says when you bring a person into custody, you have a duty, a due process duty, to provide for that person's safety and protection. Did they do that in this case? No, they did not. They tormented and they tortured Michael Crow, decrying him for his empty words, asking him if his grandma had murdered. Thank you, Your Honor. Good morning. May it please the Court. My name is John Williams. I represent Aaron Hauser and the Hauser family who are present here in the courtroom today. I'd like to reserve two minutes of my time for rebuttal. You'll have to manage it yourself. Thank you. I'd like to focus my comments this morning on two points, two brief points. The first is the decision of Hagazi v. Templeton, which was recently handed down by the Second Circuit and was the subject of a 28-J letter that we submitted to the Court. And the second deals with issues of liability with respect to Defendant Blum, the psychologist involved in the interrogation. Like the Seventh Circuit in the Sorenberger case, the Second Circuit's post-Shadda decision in Hagazi illuminates a path through the criminal case criteria that we believe this Court should follow. As this Court is aware, the self-incrimination clause of the Fifth Amendment protects an individual from being compelled to be a witness against himself in any criminal case. Hagazi viewed the criminal case under the self-incrimination clause along a continuum, where Sorenberger found at the beginning of the continuum that compelled statements used to charge the defendants in that case violated the Fifth Amendment. Hagazi reasoned from the other end of the continuum, bookmarked the continuum, if you will, and said that to the extent the Supreme Court has already found that the Fifth Amendment applies in a sentencing hearing, it must apply to something more than just trial. And based on that reasoning, looked at the continuum where a bail hearing occurred in the Hagazi case and said under Chavez, the bail hearing is part of the criminal case. And in that case, to the extent that the compelled statements were used against the defendant, found that they violated the Fifth Amendment protections. In short, as Hagazi reveals, Chavez did not make new law. What it did was it restated the criminal case criteria of the self-incrimination clause. Similarly, in this case, there were three critical points along the criminal case continuum where Aaron Hauser's Fifth Amendment rights were violated. There was the Dennis H. detention hearing where his statements were used against him and where the police lied about the state of the evidence, lied about the fact that Aaron's statements fit the state of the evidence. It's important to note that with respect to the Dennis H. hearing that the California legislature, under Welfare and Institutions Code 630, has already found that the privilege against self-incrimination applies in a Dennis H. detention hearing. Next, at the grand jury proceeding, Aaron's hypothetical statements again were used against him to show a consciousness of thought in the fact that he was a sociopath capable of committing this murder. The police lied about the state of the evidence, used those statements against him, and consequently he was charged as a result of the grand jury proceeding. My co-counsel have already mentioned that the U.S. Supreme Court on a number of occasions has confirmed that a grand jury proceeding falls under the protections of the Fifth Amendment. That's the Councilman case. The Monea case affirmed that subsequently. And finally, at the 707 fitness hearing, again, Aaron's hypothetical with respect to his statements regarding the hypothetical and coerced statements were used against him. The police again falsely testified that his statements matched exactly the statements of the other boys and that this truth box device, this CVSA device that they used during Aaron's interrogation confirmed he was lying. Again, California authority has already established in the Marcus W. case that the privilege against self-incrimination applies at a fitness hearing. So in short, if this Court were to apply Higazi's reasoning, it would be, it would properly find that the Fifth Amendment right against self-incrimination falls along all of these lines or places along the criminal case continuum and that Aaron's Fifth Amendment rights were violated at each of those procedures which are part of the criminal case. Now, with respect to Defendant Blum, I want to make a few quick points and then I'll reserve. It should be underscored that Psychologist Blum was not hired by the police to treat any of the boys. He was brought into this case to devise a plan to break them, to specify strategies and tactics which would essentially coerce them into admitting to a crime they did not commit. And that, in fact, is what he did. Now, the District Court even acknowledges, and this is a direct quote, that on this record, given the manner in which the boys were interrogated and the length of the interrogations, a reasonable jury could find that the defendants, including Blum, conspired to coerce confessions from the boys. District Court acknowledges as much. It also found that Blum acted under the color of law, hired by the police, and acted in consort with the police. And the record also reveals that the police relied on Blum's assessment strategies and tactics in their approach to the interrogations. In fact, Blum's assessments, Blum's assessments with respect to Aaron were repeated at the 707 hearing, that he was a sociopath, that he was a Charles Manson wannabe, repeated by the police. Let me ask you this. There's a difference between, conceitedly Blum wasn't there to treat the kids. Blum, nonetheless, could be brought in, could he not, without becoming liable for misconduct, if he is simply there to observe and analyze as opposed to directing what the officers are doing. In other words, if he is observing and they're saying, what is this, what are these responses reflective of, and he's giving his professional opinion. Are you suggesting that alone would be enough to make him part of a conspiracy and liable? I understand Your Honor's hypothetical. It doesn't match the facts of this case. Yeah, but answer the hypothetical. The hypothetical with respect to him being a passive observer. Passive. Passive in the sense that he's a professional observer. He's not controlling the manner and mode of the interrogation. My response would be, if he is subsequently assisting the police based upon his professional assessment in advising them on how to interrogate these boys, that he can be properly named in a conspiracy to violate their constitutional rights. The fact of the matter is, is that the police are relying upon his professional advice to do what? To violate. You're sort of eliding my question. Maybe you're trying to avoid a bright line, but I think we have authority in this circuit for the proposition that a psychologist who is advising in the course of an interrogation is, unless that person is controlling it in the sense he's more than just reacting and advising the police officers. And you say the facts don't fit my hypothetical. I'm trying to find out where he went over the line. You seem to be suggesting that if he assists, you're begging my question, I'm afraid. No, I think that active assistance in this case with respect to. . . One good example, there was this ruse phone call that Blum suggested that Joshua make to Aaron, where Joshua started to talk about the circumstances of the murder. Blum, that was Blum's idea, and the police followed Blum's direction. The whole idea of that phone call was to shock Aaron and to essentially prey on the trust of a close friend. Blum said that is something that the police should do, and the police did it. That's a prime example. So it was more than just a passive relationship here. Blum was actively involved. I think the district court record bears that out. And in this case, the police relied upon his representations in terms of the strategies and approaches. So he doesn't have to be the person asking the question. But to the extent he devises the approach and assists them in violating their constitutional rights, he should equally be held liable. Unless the Court has further questions, I'll reserve the balance of the time. Thank you, counsel. Thank you. Good morning, Your Honors. I'm Stephen Renick for the Escondido Defendants. In terms of our breakup of the time, I'll be taking ten minutes of our time. The other three sets of defendants will be taking three minutes each, if the Court wants us to do that any different. That's fine. Go ahead. Thank you. The one thing that was not mentioned during the presentations by the plaintiff's attorneys is that what the district court found was that the Escondido defendants weren't held to qualified immunity. And so what they have argued are whether or not constitutional rights were violated. And as we've argued in our briefs, we don't believe that that's the case. But I think it's very difficult to argue that even if there were constitutional violations here, that the scope at the appropriate level of specificity, to use the language from Anderson quoted in Saussure, was so clearly established that the various officers would have known that their conduct violated whatever those constitutional rights were. I have a little trouble with that. Maybe you can help me. Having watched some of the video of a 14-year-old kid isolated from his family, isolated from any adult other than the interrogating officers who lie to him, work on him, interrogate him over a sustained period of time, you think that that wasn't clearly established, that that crossed the line? I'm not aware of any case that said that. Nobody talked about abuse. No case talks about shocks the conscience. You don't think that shocks the conscience? How is it that the police get a 14-year-old boy in extreme traumatic circumstances alone in an interrogation room without any adult counseling, any ability to get some adult who's friendly to him to help him confront these police? I mean, what's the purpose of Miranda? You give it to a 14-year-old and the next thing you know he's in there. That was informed consent? Your Honor, at most that goes to whether or not the statements that were made ultimately. No, it goes to qualified immunity. That's what you're talking about. I say it wasn't clearly established. And I just find it hard to believe that it could be argued that that kind of interrogation was in violation of substantive due process. It just on its face cries out as an abusive kind of circumstance. You have a 14-year-old kid who's just deprived of any adult support and subjected to prolonged interrogation like that. Again, I'm not aware of any case that would have put these officers on notice that interrogating a juvenile 14-year-old. So this was standard operating procedure in the Escondido Police Department? I can't speak to that. Well, no, that's important because the police officers are trained in interrogation. So what is the practice and policy? What was the practice and policy of Escondido? Is this standard operating procedure then? Isolate juveniles and give them this kind of interrogation? I have to admit, Your Honor, I can't answer that. I don't have that answer. I can certainly submit that to the court. I assume you would put it on as a defense if you had it, right? I mean, that's part of a defense of qualified immunity is that everybody was doing it, in a sense. In other words, this was standard practice. It complied with the law at the time and so forth. Yes, on the other hand, the plaintiffs also have them argue that it wasn't standard practice. The issue simply isn't addressed one way or another. And I apologize. I should be able to answer it. I can't. Well, how do you deal with Cooper? Cooper was the law of the circuit then. Cooper had to do what? Cooper had two issues. One is whether or not the course of interrogation is a violation in and of itself of the Fifth Amendment. And then there's whether the conduct itself was so shocking as to violate the Fourteenth Amendment. In terms of the Fifth Amendment issue, I think that's fairly well established through Chavez that to the extent that Cooper said the course of interrogation. No, your question is on notice. Why were they on notice at that time? What sort of notice did Cooper provide these officers? Chavez came later. Well, in terms of both the Fifth and the Fourteenth Amendment or? Sure. In terms of the Fifth Amendment, it would be that a course of interrogation, can you hold you liable? As I believe the Supreme Court has said, that's not the law. The Fourteenth Amendment. No, a course of amendment, confession, coercive behavior can hold you liable if it's used. Right. But that wasn't what Cooper had said. Cooper had said the course of amendment is enough. Excuse me, the course of interrogation. Well, hasn't it been clearly established for years that coercing confessions out of people violates the Constitution? I mean, how specific do you have to get? Do you have to have a case where the person was named Michael? No, not at all, Your Honor, but I believe what the impact of Chavez is that. No, we're talking about clearly established at the time. This is your argument that the police officers have no way of knowing at the time this occurred that their actions might violate the law. What about Cooper? What about the long line of cases that says coercive investigations are unconstitutional? To the extent that was what Cooper said, then, yes, they were on notice that a course of interrogation. And Cooper wasn't a standalone first impression case. Cooper was based on a long line of cases from the United States Supreme Court prohibiting coercive tactics and trying to pursue statements from people who'd been arrested. The problem that I'm having with this discussion is that we're talking about clearly established. Well, what's not clearly established? The problem is it has to be a violation of the Constitution, and what Chavez says is merely coercive interrogation is not a violation of the Constitution, absent use. You've got use here, so where are we going? Well. You used it. You used it at the Dennis H. hearing, the 707 hearing, the grand jury. You used it. What is not clearly established in the law, even to this point, and even as a comment in one of the briefs from the plaintiff said, is where use happens. This Court may establish in the Ninth Circuit where use is, but how did these officers, how could they possibly have known? So how did they know it wasn't going to be used? You're saying that it's okay for them to engage in waterboarding, I take it, during this, so long as they don't think it's going to be used to prosecute. Is that what you're saying? They had to know at the time of the coercion whether or not it was going to be used. No. In order for them to have committed a constitutional violation, they have to have not only engaged in a coercive interrogation, but caused its use. Okay. So let's suppose it had not been used, but they waterboarded him. It wouldn't be a Fifth Amendment violation. It would be a Fourteenth Amendment substantive due process. Yes. And as I ---- So that's the line you're drawing. You're saying it's okay to have done it under the Fifth Amendment because you claim it wasn't used, so we do or don't agree with you on that. But in any event, what about the Fourteenth Amendment then? Where are you there? The standard is shocks the conscience. And Your Honor has expressed your feeling that you're shocked. I have a number of responses to that. One, I don't believe that the conduct, even to the extent that Your Honor talked about it, that you have a 14-year-old alone without a parent, has been clearly established as being shocking the conscience, such that it met the clearly established line. The other issue which I raised in my brief is how do we review this? As I commented, there doesn't seem to be in the Ninth Circuit, frankly, anywhere in the country, an established standard of review of how a shocks the conscience determination is ultimately reviewed on appeal. We have a district judge who made a determination as a judge that is that this did not shock the conscience. Our position was this has to be reviewed on abuse of discretion level as opposed to straight de novo. If that's accurate, I don't see where the Supreme Court seems to review shocks the conscience de novo as it did in the city's Sacramento case. It didn't engage in any deferential analysis at all in its view of shocks the conscience, which gives you the impression that's abuse of discretion review. The only case that I was able to find out of the Ninth Circuit that discussed that, you mentioned abuse of discretion. Granted, it wasn't in a 14th district or 14th amendment situation, but it was there. But again, you know, if it's de novo, then we go to the clearly established checklist. And again, everything, and this is pointed out numerous times by the plaintiffs, they complained that the judge, Judge Rhodes, compared everything to what had been approved in adult interrogations. And what that points out is a lack of case law on the juvenile side. It's not your typical activity of a police officer to be interrogating juveniles as witnesses and potential suspects. Their, the bulk of their work is with adults. And so absent guidance that they have to, that things that have been approved that would be acceptable in adult interrogations are not acceptable in juvenile interrogations. Why do they have juvenile courts? Why do they have juvenile proceedings? Why do you think they have those? Well, in California, juvenile proceedings are technically civil. Why do you think it's that way? Recognition of the differences and needs of children. It doesn't seem to take rocket science to figure out that when you're translating your adult confrontations to hardened, that you use with hardened criminals or adults who are mature and on their own emancipated as a matter of law and all of those kinds of things, that it takes a lot of thought to realize that you scale back or that the rules can be different if you're dealing with a vulnerable youngster. Particularly one whose sister has just been brutally murdered. And while all that may be true, how are the officers supposed to know where the line is? Common sense. Are you really arguing that the officers shouldn't have known at the time that coercing a convention was unconstitutional and that you shouldn't, they should treat kids the same as adults? Is that your argument, really? Not quite. But isn't that distilled to its essence what you're saying? They have no way of knowing we should treat kids differently. Is that really what you're arguing? That's what it sounds like. I know it's close to that. I think the bottom line is this is not a case where they were physically abusing, they weren't yelling, they weren't engaging in the sort of stuff that has been clearly said to be shocking to the conscience. And I truly believe that we're asking of these officers to basically have guessed in trying to determine whether or not these young men were involved in a murder. Why didn't they put Tweet through the same third degree? I'm sorry. Why didn't they put Tweet, or however you pronounce his name, the real killer, who they had in the police station that same day? Why didn't they put him through the same kind of rigor? They apparently didn't believe he was a viable suspect at that time. Unless the testimony was he was considered a suspect. That's why they brought him in. Well, a suspect in a very general sense. There were lots of potential suspects out there. Lots, really. Somebody had been in the neighborhood, subjected to 9-11 calls. I don't mean it in that sense, but in terms of the general investigation, he was a person who was appropriate to interview. Take his sweatshirt from him. They were trying to be comprehensive. Yes, they did take it. And he wasn't strip searched, was he? No. But there is no constitutional violation. He wasn't asked if they could strip search him? Not that I'm aware of. If we're going to critique the police for their choices in investigation, we're creating a whole new constitutional right. There is no claim that I'm aware of of defective police investigation. I don't think that's quite the point. The point is you're saying the officers applied the standard procedure that they would have applied to an adult suspect to a child. And yet, when you look at the circumstances, they don't apply anything close to what they're doing vis-a-vis Michael. So they zeroed in on Michael as the prime sole suspect, apparently. And, therefore, they translated that into the ability to use every ploy and device that they could think of short of physical torture. Well, I wouldn't go that far. But I never said that this was the standard procedure used with every possible suspect. Well, I don't know what you're saying, Counsel, because you keep talking about how would the officers know that what they use on adult suspects can't be used on a child. Is this a unique experience or not? I mean, this is the kind of thing that would have been done with an adult, if he'd been 18 or 25. If he was the prime suspect. If he was the prime suspect. And they never had a homicide investigation before where they involved a prime suspect as an adult. So they suddenly have to make this all up on the spot, and it just so happens it's a 14-year-old that they have to invent this for.  Why are you invoking, then, the notion that what they're doing is what they would apply to an adult? You somehow say that, well, they wouldn't have known. So are you saying that it would have been fine if he had been an adult to do this kind of thing? That's what they've done in the past? I think even the plaintiffs acknowledge that, that all of the things that they have complained about, and I apologize to my co-counsel. We're keeping you over time. I don't think there has been any dispute that what the officers, that the conduct that has been questioned has been found under various circumstances in various cases, granted involving adults as to either being not coercive or, depending on the particular facts, whether or not it's coercive. What really seems to be at issue here is that it's not any individual part. It's the entire package that made it shocking or The totality of the circumstances. And with all due respect, how are the officers supposed to know that this totality of the circumstances when the individual parts are not clearly in violation of anything? Thank you, counsel. Thank you, Your Honor. Who's next? Would you put three minutes on the clock? Thank you. May it please the Court. My name is Cindy Tobesman. I'm here on behalf of the Oceanside Defendants. I'd like to remind the Court that Detective McDonough's involvement in this investigation was limited. He came to Escondido after Escondido contacted the Oceanside Police Department and asked it to send over somebody who could operate the computer voice stress analyzer. Detective McDonough went to Escondido. He interviewed each of Aaron and Michael only once. Those interviews were not coercive. Nobody confessed to anything. Nobody made involuntary statements.  He had no further involvement in these boys' questioning. At the time, he had no further involvement. He had no involvement at all in the arrests, the searches, the making out of probable cause affidavits, the making out of search warrant applications. He didn't collect evidence, didn't know if there was inculpatory or exculpatory evidence. He went home. I don't think there's a basis for liability as to Detective McDonough, and I believe that any contrary result would announce a dangerous precedent and deter cooperation among police departments. Now, plaintiffs have argued that the aggregate effect of these interrogations was coercive. Now, even if that were so, I don't believe that the responsibility for that coercive effect is properly laid at Detective McDonough and Oceanside's feet. They had no part in formulating interview tactics. They didn't know how long the boys would be interviewed, by whom, for how frequently they'd be brought in. Detective McDonough came in, he performed his interviews, and he went home. I think also that qualified immunity undoubtedly applies to Detective McDonough. I don't believe any reasonable police officer would believe that his interviews were coercive. In fact, both the State Court and the District Court found or concluded that these two interviews were lawful. Two judges could come to that conclusion. I believe that a reasonable police officer could have come to the same conclusion. Now, if the Court has no questions particular to my clients, I will defer to the other defendants. Certainly. Thank you, Counsel. I'll put three more minutes on. Thanks. If it may please the Court, good morning. My name is Scott Lody, and I represent Dr. Lawrence Blum, and I'll really briefly address counsel for Aaron Hauser's contentions. First of all, Dr. Blum did not set up this ruse phone call. There's absolutely no evidence anyplace in the record that that occurred. What did occur is on January 27th, Joshua Treadway told the police that Aaron Hauser had provided him with the knife that the police had tested and believed was the murder weapon, and that Aaron Hauser told him that it was the murder weapon. And a few days after that, the police themselves come up with the idea of setting up this ruse phone call between Treadway and Hauser, and then the tape is sent to Dr. Blum. But he has nothing to do with orchestrating that event. When did Dr. Blum become involved in this affair? Dr. Blum became involved in the affair on January 23rd when Sergeant Anderson calls him up in Long Beach and tells him they have a murder suspect and they would like him to come down and observe the interrogation. Observe? Yes, that's what he did. Then what happened? The other side, just to refresh your recollection, says that the district court opined that there was enough evidence to create a genuine issue of material fact for the proposition that Blum helped the police devise a plan and conspired with them under color of law to avulse statements out of these people. They're using a single sentence somewhere in that 72-page opinion that mentions defendants. Actually, the district court did specifically analyze Dr. Blum's involvement with respect to whether he was involved in a conspiracy and concluded that there was no evidence whatsoever that Dr. Blum was involved in any type of conspiracy. So the sentence that they're referring to leads with the word defendants? Yes. And there's a separate section? Correct. There is a separate section. This says Blum didn't have anything to do with the conspiracy? Absolutely. That there was no evidence that Dr. Blum conspired with these officers who he had never met for the purpose, basically, if what their conspiracy is is that they were going to coerce confessions from these boys so that they could cover up from some officer who was at the Crow House the night of the murder, an officer Dr. Blum, of course, didn't have any knowledge of. To save time, do you have a specific excerpt of record cite as to the part where Dr. Blum is? You know, I believe I do. If you give me one second. Page 1116 through 1118 in the district court opinion. Why don't you read a couple of the key sentences? I have the opinion at the desk. Go ahead. It's always interesting when one side says the court said Dr. Blum conspired and the other side said, no, the court said Dr. Blum didn't conspire. Well, I agree that the district court does have some reference generically to defendants, but the district court did go. Specific governs the general. Correct. Did go well out of its way to address the issue of conspiracy in Dr. Blum. It's a rather lengthy opinion. I do have it highlighted. You know, it's useful when I don't contend this is criticism, but it's a helpful suggestion when lawyers say the record says X, you're probably going to ask by the court, you know, be specific, back it up. Correct. The court states here, although defendant Blum participated in the interrogation, there's absolutely no evidence that he was even aware of the alleged conspiracy or its objectives, let alone he was a part of this conspiracy. And what page is that again? I believe that's on page 1117. Okay. Thank you. And then the court goes on for three more paragraphs discussing why there is no evidence that Dr. Blum conspired with these parties. And I think the court cites the case law where anybody can allege conspiracy, but you need concrete evidence, I believe, is the standard in order to prove it because it's so easy to allege. So did your client make a clinical finding of sociopathic personality? I do not believe he did. And when your client said this person was a Charles Manson type, on what clinical findings did your client base that? I don't believe he made any clinical findings. I believe he listened to the recorded telephone conversation, and based upon his impression of Aaron Hauser attempting to control Joshua Treadway, who was on the other end of the line, Dr. Blum made that comment that you're referring to. Thank you, counsel. Thank you. Thank you. If you may, please, Your Court. My name is George Brewster. I represent the Pele-Summer-Steffen. I was really only in this on a defamation claim, and I'll be very, very brief. I think now that the facts are known, now that the facts are known, we know that Steffen, as the prosecutor, stepped into this case well after everything we've talked about this morning had already occurred. So she was not the prosecutor early on in this case. She was the prosecutor at the end of the case. She's only in on defamation claims. There's an allegation of defamation plus, but there is no connection to the coerced statements. In fact, as the transcript shows, the two hours and 20 minutes, that 48 hours spent with her, was reduced down to about three minutes on the television show. She took great pains, great pains, to try to tie everything to the record to the admissible evidence. The only two statements discussed in the record before the Court, one has to do with a handheld game, which is not in any way a statement that amounts to defamation. The other is this idea that Michael Crow hated his sister. And if you look to the treadway, the admissible portions of the treadway, non-coerced, no findings of coercion, April 10, 1998, treadway afternoon post-miranda statements, you can find in there that he said that Michael Crow disliked his sister and wanted to kill her. In the morning session on that same day, un-mirandized but not coerced, finding that it wasn't coerced, Mr. Treadway also says that he hated, Michael hated his sister. That's the basis of the response that Sumner Stephan gave to 48 hours when she was asked, well, why did the police consider him a suspect? And so she responded, these are the things that we have, these are the statements we have. And it's not just that, but there were also the computer story that Michael had written and other things. So based on the facts known now in this case, because we were here seven years ago on a 12-6 denial on the defamation claim, but now we're back because the facts are known, there is no defamation. So you never get to the defamation plus or anything else. And I think the Court, Judge Rose was absolutely correct in his findings that Sumner Stephan should be dismissed from this case. There is no defamation as a matter of State law. And if the Court has no other questions, that's it for me. Thank you, counsel. Thank you very much. We'll give each two minutes for rebuttal. Or if you want to take them all, you can take them all. Go ahead. Thank you, Your Honor. To hear the city of Escondido tell the Court that it was not clearly established that minors need to be treated with the greatest of care is to ignore 60 years of U.S. Supreme Court jurisprudence, starting with the Haley case, the Gallegos case, and the Gold case, which specifically say how minors are easy victims to the inquiry and how the greatest care has to be used by both the police in interrogating minors and the courts in reviewing the voluntariness of any confessions that are brought from minors. This was well-settled law that the police should have known about. It has never been controverted. And the problem with the district court's opinion, the core problem with the opinion is it too nowhere mentions Haley, Galt, or Gallegos. It never applies the proper standard. It only applies the standard with respect to what is acceptable for fully emancipated adults, and that is not acceptable under the Supreme Court guidance that was at their disposal. Those cases also establish that a shock to conscience analysis is reviewed de novo, again, clearly established for over 60 years. With respect to psychologist Blum, there is evidence in this record that Blum contracted with the police department to create the strategy. But you told us that the district court concluded there was enough evidence to create a genuine issue of material factors to his participation in a conspiracy. That's right. With respect to all defendants. You told us that with the... With respect to all defendants. I'm sorry. Did you hear counsel read the section where the district court said there's no evidence that Blum participated in the conspiracy? Yes. And I think that what the court said initially was that there was evidence to support that all these defendants participated in this conspiracy, and then it simply ignored the evidence, incorrectly we believe, of Blum's involvement. Well, that's playing a little fast and loose with the record. If there's a specific reference to Blum and the court says there's no evidence that he participated in the conspiracy, to use the general word defendants and try to extrapolate from that to include Blum. No, I did not mean to deceive the court by asserting that. I think that the evidence in the record that Blum was retained for that purpose and that, in fact, the court ignored that evidence. With respect to McDonough and the arguments made there, McDonough was intimately involved in Aaron Hauser's interrogation, and he conducted that interrogation using all of the hallmarks that the Haley, the Gould, and the Gallegos court said were impermissible when used with a minor, false pretenses, deception, threats of harsh treatment. We believe McDonough intimately participated. The other side tells us that he was called up, came down to use the stress analyzer, did it, and left. And we disagree. We think the record supports the fact that McDonough conducted that interrogation with the CBSA truth box, with Aaron, and used all of these devices, which again were clearly established as being impermissible to employ in interrogations of minors. With that, I will yield the balance of my time to my co-counsel. Roberts. Thank you. Judge Trott, I'd like to address this thing about the record and what the court said and my understanding of what the court said involving the conspiracy. The district court distinguished, I think, incorrectly, and I don't have the page in front of me, but I have a good memory. And I remember that what the court was drawing a distinction between was something that he called the conspiracy and the, quote, larger conspiracy. And my reading of what that opinion says. When was the last time you read it? Probably five days ago. I'm going to rely on my own reading of it at this point. Okay. But I do believe he refers to the larger conspiracy and that. I'll read it myself. Okay. Fine. When I'm getting this kind of disparate input from the lawyers, I don't pay any attention to the lawyers. I'll read it myself. All right. And then you were on the panel that decided the earlier case involving Summer Steffen. And my reading of that opinion is that the court said that there were facts that remained to be determined, because at that time, I pointed out to the court that I didn't know when she'd made those statements. Well, I looked at the entire statement in context. And at the very end, she's asked, are you saying these boys did it? And she says, no, no, no, I'm not saying that at all. Well, I think that the – And then the other part, she's simply describing a lot of the evidence. But she doesn't come right out and say or imply that the boys did it. She says at the end, I don't know, I'm not saying that at all. Doesn't that deprive you of a defamation cause of action? No. Because of the case law that I've cited, I think the analogy I would use, it's like Brutus is an honorable man. If you look at that entire statement in context, my position is that it is reasonably susceptible to her saying that these boys are the killers. Even though she said at the end when she was asked that specific question, I'm not saying that at all. Well, you say at the end she actually says it – she says it throughout. But that's a false light, Klein. You haven't pled false light, have you? You've just pled straight defamation. No, defamation. Well, I think that just saying – I think if you say that Michael was suspected of murdering his sister because he was playing with a handheld video game, and that's false. He wasn't playing with a handheld video game. And you're explaining that's why he's suspected of murder. Yes, I don't think that the court below is correct in saying that that's not reasonably susceptible to an interpretation that is defamatory. Thank you, counsel. Thank you both. Thank all of you for your arguments and your briefing. The case has just been presented for submission. And we'll be in recess for the morning. Thank you.
judges: Trott, Thomas, Fisher